******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* HIRAL M. PATEL
## (AC 41821)

Alvord, Bright and Bear, Js.

*Syllabus*

Convicted of the crimes of murder, home invasion, burglary in the first degree as an accessory, robbery in the first degree as an accessory, conspiracy to commit burglary in the first degree and tampering with physical evidence in connection with the shooting death of the victim, the defendant appealed, claiming, inter alia, that the trial court improperly admitted into evidence certain statements by his coconspirator, C, that inculpated the defendant, and precluded him from introducing into evidence a statement by S, a cousin of the defendant, that was against S's penal interest. N, a cousin of the defendant who had been charged with narcotics offenses, enlisted the defendant and C in N's plan to rob the victim, with whom N previously had engaged in drug transactions. N drove the defendant and C to an area near the victim's home before driving away. After the defendant and C entered the victim's home and tied up his mother, C went upstairs, shot the victim and ransacked his bedroom looking for money. The defendant and C then fled into the woods, where the defendant lost his cell phone, and they thereafter met up with N and drove away. N subsequently was convicted of murder in a separate trial, and this court affirmed his conviction on appeal. In the defendant's trial, C, in response to a question by the court and without having been sworn in, informed the court that he would exercise his fifth amendment privilege against self-incrimination and refuse to answer questions if he were called to testify. The court thereafter admitted into evidence a tape recording of a conversation between C and E, a jailhouse informant, that was made after E told correction officials that he would be willing to record his conversations with C without C's knowledge. The court further admitted into evidence testimony from C's girlfriend, B, about statements C had made to her and precluded the defendant's sister, M, from testifying that S had told her that S was with C during the incident. *Held*:

1. The trial court did not abuse its discretion when it admitted C's statements to E and B pursuant to the dual inculpatory statement exception to the hearsay rule under the applicable provision (§ 8-6 [4]) of the Connecticut Code of Evidence:

   a. The defendant could not prevail on his unpreserved claim that the trial court improperly found that C was unavailable to testify because C was not under oath when questioned about his fifth amendment privilege; that court's failure to have C sworn in did not violate the defendant's sixth amendment right to confrontation or constitute plain error, as the defendant made no claim that C's privilege against self-incrimination might not pertain to all of the questions that he would have been asked, and the defendant did not contend that C would have answered some questions or that the court's inquiry of C as to his personal invocation of the privilege was deficient in substance.

   b. The trial court did not violate the defendant's sixth amendment right to confrontation when it admitted C's statements to E, this court having determined in N's appeal that C's statements to E bore none of the characteristics of testimonial hearsay; C's statements, which implicated himself, N and the defendant, were made to his cellmate in an informal setting, there was no indication that C anticipated that his statements would be used in a criminal investigation or prosecution, and although the evidence suggested that the recording of C's statements was initiated by the Department of Correction and that the police had spoken to E prior to the recording, which was not clear from the testimony in N's trial, an objective witness would not reasonably believe that C's statements could be used at a trial, as there was no indication under either scenario that C had knowledge that he was speaking with a jailhouse informant, the determination of whether C's statements were testimonial focused on the reasonable expectations of C, and nothing about the circumstances suggested that a person in C's position would intend his

statements to be a substitute for trial testimony.

c. This court found unavailing the defendant's unpreserved claim that C's statements to E were testimonial under the due process and confrontation clauses in article first, § 8, of the state constitution, as the defendant did not identify any compelling economic or sociological concern that supported a change in the interpretation of the confrontation clause in article first, § 8, of the state constitution.

d. The trial court did not abuse its discretion when it admitted C's statements to E and B pursuant to § 8-6 (4), as that court's findings adequately supported its conclusion that C's statements presented sufficient indicia of reliability to justify their admission: C made the statements to E, a fellow inmate who was facing serious charges and appeared to be a fellow gang member, the details of the crime were related only by C, and it was within the trial court's discretion to evaluate the consistencies and inconsistencies in C's statements and to conclude, on balance, in favor of a determination that the statements were reliable; moreover, C had a close relationship with B, and his statements to her were made on the day of the crime and were consistent with other evidence, and even if C downplayed his involvement when he admitted to B that he robbed the victim while failing to offer that he also murdered the victim, C directly and explicitly incriminated himself by admitting his participation in the robbery, and, thus, the statement remained against his penal interest.

2. The trial court did not abuse its discretion when it excluded from evidence M's testimony concerning S's statement to her on the ground that it was not trustworthy and, thus, did not satisfy the requirements of § 8-6 (4): although S's statement that he should have been charged with murder instead of the defendant was against his penal interest, the relationship between M and S did not support a finding of trustworthiness, as M acknowledged that, although they had been close while growing up, she did not see S as much as she did before she entered medical school, that she had seen S only twice in the past year and that it had been years since she had more steady contact with him, and there was no evidence that S had ever repeated his statement to M or made inculpatory statements to others; moreover, contrary to the defendant's assertion that S's statement was supported by corroborating circumstances, statements of the victim's mother, in which she described the intruders, were inconsistent, the lack of proof that S was at a location distant from the crime was not necessarily corroborative of his statement, other statements S had made did not corroborate the key portion of his statement to M but suggested merely that he was involved in the crime to some degree, and circumstances surrounding the murder were far more consistent with a finding that the defendant had entered the victim's home, rather than S.

3. The defendant could not prevail on his claim that the trial court abused its discretion when it denied his motion to preclude the state from offering the testimony of an agent with the Federal Bureau of Investigation about cell phone tower data analysis relative to the movement of cell phones associated with the defendant, N and C on the day of the murder: contrary to the defendant's assertion that the court improperly failed to conduct a hearing pursuant to *State* v. *Porter* (241 Conn. 57) to determine the reliability of the agent's methods and procedures, the court held the functional equivalent of a *Porter* hearing, as there was ample testimony bearing on the relevant *Porter* factors and sufficient testimony to enable the court to determine whether the agent's methods were reliable, and although the court did not use the words rate of error or peer review in its ruling, it appropriately relied on the experience of other experts who had carried out similar work and noted that the agent's findings were reviewed by other experts in the same field; moreover, the defendant's assertion that the absence of sector analysis in the data rendered the agent's calculations and conclusions less precise and accurate than they would have been with a sector-based analysis was unavailing, as defense counsel did not identify at trial the defendant's alibi that he was out of state at the time of the crime as a factual distinction requiring the court to reconsider its ruling on the issue in N's trial, nor did he explain to this court how sector analysis would be more reliable, when the state, in light of the defendant's alibi, sought only to identify the general area in which his phone was present.

4. The evidence was sufficient to convict the defendant of murder under a theory of liability predicated on *Pinkerton* v. *United States* (328 U.S.

640); it reasonably was foreseeable that the victim might fight back to thwart the robbery of his proceeds from a drug sale and that C, who was armed with a loaded gun, might, in furtherance of the conspiracy, cause the victim's death with the intent to do so, and the defendant's role in the incident was not too attenuated that it would have been unjust to hold him responsible for the criminal conduct of C, as the defendant had communicated with N about the crime days prior thereto, planned to enter the victim's home to rob him of money he had received from a drug sale and restrained the victim's mother after entering the home.

Argued May 14—officially released November 12, 2019

*Procedural History*

Substitute information charging the defendant with the crimes of felony murder, murder, home invasion, burglary in the first degree as an accessory, robbery in the first degree as an accessory, conspiracy to commit robbery in the first degree, conspiracy to commit burglary in the first degree and tampering with physical evidence, brought to the Superior Court in the judicial district of Litchfield and tried to the jury before *Danaher*, *J.*; thereafter, the court denied the defendant's motions to preclude certain evidence; verdict of guilty; subsequently, the court denied the defendant's motion for a new trial and granted the defendant's motion to vacate the verdict as to the charge of felony murder; thereafter, the court vacated the verdict as to the charge of conspiracy to commit robbery in the first degree; judgment of guilty of murder, home invasion, burglary in the first degree as an accessory, robbery in the first degree as an accessory, conspiracy to commit burglary in the first degree and tampering with physical evidence, from which the defendant appealed. *Affirmed.*

*Richard Emanuel*, for the appellant (defendant).

*Matthew A. Weiner*, assistant state's attorney, with whom, on the brief, were *David S. Shepack*, state's attorney, and *Dawn Gallo*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Hiral M. Patel, appeals from the judgment of conviction of murder in violation of General Statutes § 53a-54a, home invasion in violation of General Statutes § 53a-100aa (a) (1), burglary in the first degree as an accessory in violation of General Statutes §§ 53a-101 (a) (1) and 53a-8 (a), robbery in the first degree as an accessory in violation of General Statutes §§ 53a-134 (a) (2) and 53a-8 (a), conspiracy to commit burglary in the first degree in violation of General Statutes §§ 53a-101 (a) (1) and 53a-48, and tampering with physical evidence in violation of General Statutes § 53a-155 (a) (1).[1] On appeal, the defendant claims that (1) the court erred in admitting into evidence dual inculpatory statements of his coconspirator, Michael Calabrese; (2) the court erred in precluding the defendant from introducing into evidence a statement of Shyam Patel (Shyam), a cousin of the defendant, that was against his penal interest; (3) the court erred in admitting historical cell site location information without conducting a *Porter*[2] hearing; and (4) there was insufficient evidence adduced at trial to sustain his conviction of murder on a theory of *Pinkerton*[3] liability. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On June 12, 2012, police arrested Niraj Patel (Niraj), the defendant's cousin, after a motor vehicle stop and seized $12,575 from his person and his vehicle. He was charged with criminal attempt to possess more than four ounces of marijuana, interfering with an officer, tampering with evidence, possession of drug paraphernalia, and motor vehicle charges. Following his arrest, Niraj unsuccessfully attempted to borrow money from family members to pay his attorney.

Niraj thereafter formed a plan to rob Luke Vitalis, a marijuana dealer with whom Niraj had conducted drug transactions. Vitalis lived with his mother, Rita G. Vitalis, at 399 Cornwall Bridge Road in Sharon. On August 3, 2012, Niraj sent a text message to the defendant, stating: "I throw you some dough to do this if you have to bring Diva," who was the defendant's family dog. The defendant responded by stating: "You fig a ride out." Niraj responded: "Yes." The defendant replied: "Word." Niraj also offered Calabrese, a friend, money to participate in the robbery.

Niraj knew that Vitalis had sold ten pounds of marijuana from his home on August 5, 2012, and set up a transaction with Vitalis for the following day, with the intention of robbing Vitalis of his proceeds of the previous sale. On August 6, 2012, Niraj drove Calabrese and the defendant to the area of Vitalis' home and dropped them off down the road. Calabrese and the defendant ran through the woods to Vitalis' home. They watched the home and saw Vitalis' mother come home.

At approximately 6 p.m., Calabrese and the defendant, wearing masks, bandanas, black hats, and gloves, entered the home, encountered Vitalis' mother, and restrained her using zip ties. Calabrese, armed with a Ruger handgun that he received from Niraj, went upstairs and encountered Vitalis in his bedroom. He struck Vitalis with the handgun and shot him three times, killing him. Calabrese searched the bedroom but could find only Vitalis' wallet with $70 and approximately one-half ounce of marijuana, both of which he took. Calabrese and the defendant ran from the property into the woods, where the defendant lost his cell phone. Calabrese and the defendant eventually met up with Niraj, who was driving around looking for them. Calabrese burned his clothing and sneakers on the side of Wolfe Road in Warren.[4]

After freeing herself, Vitalis' mother called 911. State police troopers arrived at the scene at approximately 6:14 p.m. and found Vitalis deceased. Some of the drawers in the furniture in Vitalis' bedroom were pulled out. The police searched the bedroom and found $32,150. They also found marijuana plants growing in the home and outside, 1.7 pounds of marijuana inside Vitalis' bedroom closet, and evidence of marijuana sales.

The defendant's parents, who were traveling out of state on the day of the crime, owned a package store in Madison. While the defendant's parents were away, the defendant was supposed to assist the store's employee, James Smith, and provide him with a ride home at night. On the afternoon of the day of the crime, Smith called the defendant to ask him to pick up single dollar bills for the store, but could not get in touch with him. The defendant's parents also could not reach him and, eventually, they called a family member, Sachin Patel (Sachin). Sachin left his job at 6:30 p.m. and arrived at the store at about 7 p.m. After Sachin could not reach the defendant on his cell phone, Sachin went to the defendant's house in Branford, let the dog out, and continued to call the defendant from the house phone. Sachin left the defendant's house at about 8:30 p.m. and returned to the store to give Smith a ride home.

On September 11, 2013, the defendant was arrested. Following a trial, the jury, on February 1, 2017, returned a guilty verdict on all counts. The court, thereafter, rendered judgment in accordance with the jury's verdict. See footnote 1 of this opinion. The court imposed a total effective sentence of forty-five years of imprisonment, execution suspended after thirty-five years and one day, twenty-five years of which were the mandatory minimum, with five years of probation. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court erred in admitting into evidence "dual inculpatory statements"

made by Calabrese. First, he contends as a threshold matter that the state failed to prove Calabrese's unavailability because Calabrese was not under oath when he invoked his fifth amendment privilege. Next, he claims that Calabrese's statements made to a jailhouse informant, Wayne Early, were testimonial, and that the introduction into evidence of the recording of those statements violated his federal and state confrontation and due process rights. He further contends that the recording and the testimony of Britney Colwell, Calabrese's girlfriend at the time of the crime, regarding statements Calabrese made to her, also were inadmissible pursuant to § 8-6 (4) of the Connecticut Code of Evidence. We consider each of these claims in turn.

A

As a threshold matter, the defendant contends that "the court erred in finding that Calabrese was 'unavailable' because Calabrese was not under oath when questioned about his fifth amendment privilege." The defendant acknowledges that his claim is unpreserved but nevertheless seeks review pursuant to the bypass doctrine set forth by our Supreme Court in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), or reversal pursuant to the plain error doctrine.[5] The state argues that the defendant's argument is meritless, emphasizing the defendant's "fail[ure] to cite a single case that holds that a trial court's finding of 'unavailability' must be based on the sworn testimony of the purportedly unavailable witness."[6] We agree with the state that the court did not err in finding Calabrese to be unavailable and, therefore, the defendant has not shown the existence of a constitutional violation or met the stringent standard for relief pursuant to the plain error doctrine.[7]

The following additional procedural history is relevant. On the morning of January 4, 2017, the court stated that defense counsel wanted a "record to be made as to whether . . . Calabrese would be willing to testify if he were called by either party in this case or if, alternatively, he would seek to invoke his rights under the fifth amendment." Defense counsel represented his understanding "that the state does not intend to call this gentleman based on their understanding that he's going to invoke his fifth amendment privilege. It is my position that, if that's to be done, it should be done by the witness himself . . . on the record in court; his lawyer can't do it for him." Calabrese was present in court with his counsel, Attorney Gerald Giaimo. Responding to the court's inquiry, Calabrese stated that he had the opportunity to talk with Attorney Giaimo about the proceeding. In response to the court's question concerning whether he would answer questions if he were called as a witness in the defendant's case, he stated that he "would plead the fifth." In response to

the court's follow-up questions, Calabrese confirmed that he planned to invoke his rights under the fifth amendment. The court inquired of the parties whether there was "any question in the mind of either party as to whether this is a valid invocation of the fifth amendment privilege," and defense counsel responded that he had "no question about that" but requested "a follow-up question in terms of whether or not he would intend to invoke his fifth amendment rights with respect to every question he might be asked, not just generally." Defense counsel asked to inquire, and the state objected. The court indicated that it did not think it was necessary for defense counsel to inquire. Defense counsel stated that he wanted to know whether Calabrese's invocation of the fifth amendment "applie[d] to every question that is asked of him relevant to this case." The court then asked Calabrese: "[i]f you were to be asked questions about the facts of this case by either party, what position would you take?" Calabrese stated that he would "take the fifth." The court then asked: "Anything further?" Defense counsel responded: "Nothing from me."

The court found that Calabrese had made a valid invocation of his fifth amendment privilege, stating that it believed that if "Calabrese were to answer any questions relative to the facts of this case, they could have a tendency to incriminate him." The court again asked whether there was "[a]nything further from either party," to which defense counsel responded, "[n]othing further."

"Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *State* v. *Walker*, 332 Conn. 678, 688, 212 A.3d 1244 (2019). We conclude that the defendant's claim is reviewable under the first and second prongs of *Golding*. Accordingly, we turn to the third prong of *Golding*—namely, whether the defendant has established a violation of his sixth amendment confrontation rights.

In support of his claim that his sixth amendment right to confrontation was violated, the defendant cites *State* v. *Cecarelli*, 32 Conn. App. 811, 821, 631 A.2d 862 (1993). In *Cecarelli*, the trial court accepted the representation made by counsel for a witness that the witness would invoke his fifth amendment privilege regardless of the question he was asked. Id., 817. The witness did not

appear in court, and the court denied the defendant's request for a hearing to determine whether a valid privilege properly was claimed as to questions concerning the scope and extent of the witness' actions as a police informant. Id., 817–18. On appeal, this court concluded that the trial court's failure to hold a hearing implicated the defendant's constitutional right to present a defense. Id., 821. Noting that "a question-by-question invocation of the privilege against self-incrimination may not be required under all circumstances," this court concluded that the sustaining of a blanket privilege claim was not appropriate given the circumstances before the trial court, and that a hearing was required. Id., 820.

*Cecarelli* is distinguishable from the present case in that the defendant in *Cecarelli* challenged the witness' assertion of his constitutional privilege on the ground that it might not pertain to all of the questions the defendant sought to ask regarding his entrapment defense. Specifically, this court reasoned: "We cannot speculate that the defendant's entrapment defense may be inextricably bound up with a scheme of criminality on the part of [the witness] and that all questions asked of [the witness] to corroborate that defense might require answers tending to incriminate him. That determination may be reached only at a hearing for that purpose, which would allow the trial court to explore the basis, if any, of the witness' refusal to testify, if he does, in fact, invoke his privilege." Id., 821. Here, the defendant makes no claim that Calabrese's constitutional privilege might not have pertained to all of the questions that would have been asked of him.

On point with this case is *State* v. *Nieves*, 89 Conn. App. 410, 417, 873 A.2d 1066, cert. denied, 275 Conn. 906, 882 A.2d 679 (2005). In *Nieves*, this court rejected the defendant's claim "that the [trial] court violated his sixth amendment right to present a defense simply by failing to hold a hearing, requiring [the witness] to take the stand and personally to invoke his fifth amendment privilege." Id. In *Nieves*, the court permitted the witness' counsel to represent that his client would invoke his fifth amendment privilege against self-incrimination as to all questions. Id., 416–17. The defendant did not request a hearing but moved to compel the witness to testify. Id., 416. On appeal, this court noted that "there is no claim that [the witness] might have answered some relevant questions that would go to the defendant's defense"; id., 418–19; and found the defendant's argument premised solely on the fact that the witness personally did not invoke the privilege at a hearing unavailing. Id., 420–21.

The defendant's sole challenge to the court's unavailability finding is that Calabrese had not been administered an oath prior to his testimony, during a hearing before the court, that he would assert his fifth amend-

ment privilege not to testify. The defendant does not contend that Calabrese would have answered some questions or that the court's inquiry of Calabrese as to his personal invocation of the privilege was deficient in substance. We cannot conclude that the court's failure to have Calabrese sworn in violated the defendant's sixth amendment right to confrontation or constituted plain error. Accordingly, the court did not err in finding Calabrese to be unavailable.

## B

Having concluded that the court did not err in finding Calabrese to be unavailable, we now consider the defendant's claim that the court improperly admitted into evidence Calabrese's statements to Colwell and Early.

The following additional facts and procedural history are relevant. In statements made to Colwell on the day of Vitalis' killing, Calabrese admitted his participation in the robbery. Subsequently, in September, 2013, Calabrese detailed the events surrounding Vitalis' killing, implicating himself, Niraj, and the defendant, in a recorded statement to a confidential inmate informant.

Our analysis of this issue requires discussion of filings in Niraj's trial on charges stemming from the same incident.[8] In Niraj's trial, he filed a motion in limine seeking to preclude the state from introducing into evidence out-of-court statements made by Calabrese in lieu of his live testimony, contending that the admission of his statements would violate the fourth, fifth, sixth and fourteenth amendments to the United States constitution, article first, §§ 8, 9 and 10 of the Connecticut constitution, and Practice Book § 42-15. See *State* v. *Patel*, 186 Conn. App. 814, 831, 201 A.3d 459, cert. denied, 331 Conn. 906, 203 A.3d 569 (2019). On December 31, 2015, the court issued a ruling denying Niraj's motion without prejudice.

Addressing Calabrese's statements to Early, the court noted the passage of time, thirteen months, as a factor weighing against the trustworthiness of the statements. The court further considered that Calabrese's statements "were made to a fellow inmate who appeared to the defendant to be a fellow gang member, and one who was facing serious charges." The court found that the statements were "replete with specific details of the crime," and stated that inconsistencies identified by the defendant were not as significant as they appear and "pale[d] in comparison to the myriad details of the crime that could only be known to a participant in the crime." Considering the extent to which the statements were against Calabrese's penal interest, the court noted that Calabrese explicitly stated that he killed Vitalis and "ma[de] clear that any other person involved is less culpable than he is." The court also considered that Calabrese had initiated the discussion about the crime on September 3, 2015, and that Calabrese had made

statements to Colwell that were consistent with his statements to Early. Last, the court stated that the state offered cell phone location evidence linking Calabrese to the crime. The court concluded that Calabrese's statements to Early were admissible as statements against penal interest pursuant to § 8-6 (4) of the Connecticut Code of Evidence. The court further concluded that Calabrese's statements to Early were not testimonial.

Regarding Calabrese's statements to Colwell, the court found that the statements constituted declarations against penal interest pursuant to § 8-6 (4), in that the "statements were made to a confidante; they were made just before, on the day of, and the day after, the homicide. Their trustworthiness lies in not only the foregoing facts, but in their consistency with other physical evidence in the case, including the time of the statements relative to the event; the specific admissions of theft that were consistent with other evidence relative to the theft and the statements regarding clothing that were consistent with the declarant's efforts to destroy clothing that might carry evidence of the crime."

In the trial underlying this appeal, on August 3, 2016, the defendant filed a similar motion in limine seeking to preclude the state from offering into evidence Calabrese's out-of-court statements. In his memorandum of law in support of his motion, the defendant recognized that the issue had been considered and ruled on by the court in connection with Niraj's trial. On November 8, 2016, the court, at the request of defense counsel and without objection from the state, took judicial notice of the totality of the filings and the transcripts in Niraj's trial. Later that day, the court noted that, in Niraj's trial, it had ruled on a motion in limine regarding Calabrese's statements and asked whether "there are any changes in the law since that ruling that require a different result and, alternatively, whether there are any factual developments that you wish to bring to my attention that might bring about a different result." Defense counsel responded, "[n]o, as to both, Your Honor." The court indicated that "it would appear that the law of the case would control,"[9] and the state agreed. The court asked defense counsel whether he had anything further, and defense counsel replied: "No, I just want to make—I think we agree that in the event that this has to—this case has to go beyond as proceeding subsequent to the verdict, that Your Honor is relying—and [the] defendant will have available the record of the Niraj Patel file—trial . . . with respect to the arguments and the submissions." The state had no objection to that request. The court then stated: "Well, the law of the case is not absolute, but under the circumstances expressed by the defense in the motion and the responses to my questions today, I find that the law of the case controls that the ruling of December 31, 2015, will control this motion

as well, and the motion is denied for the reasons set forth in that opinion."

On January 6, 2017, the state called Early as a witness. Early, who remained incarcerated at the time of the defendant's trial, testified that while incarcerated at the New Haven Correctional Center, he was called to the intelligence office, informed that Calabrese was going to be moved into Early's cell, and asked whether he would be willing to wear a recording device to record Calabrese.[10] Early, who previously had made confidential recordings of other inmates, indicated he would be willing to do so, and Calabrese was moved into his cell that evening. Later that evening, the two discussed the crimes for which they were incarcerated. Early stopped the conversation, however, because he knew he was going to wear a recording device and did not want to repeat the same conversation the next day. The next day, Early again was called to the intelligence office and asked whether he " 'could do it,' " and Early responded that he could. The intelligence officer then placed a telephone call to the state police, in which Early was asked what he knew about the case. Early responded that he did not know anything about it, and the state police asked Early to get as many details as possible. The intelligence officer then placed the recording device in Early's shirt pocket.

Early went back to his cellblock recreation area, a lockdown was called, and he went back to his cell with Calabrese. The two engaged in a lengthy conversation, in which Calabrese detailed the events surrounding Vitalis' killing, implicating himself, Niraj, and the defendant. Over the defendant's objection, the recording was played for the jury during trial.[11] The defendant renewed his objection to the admission of the recording in his motion for a new trial, which was denied.

On January 18, 2017, the state called Colwell as a witness, who testified that in August, 2012, she lived with her boyfriend at the time, Calabrese, at their condominium in Branford. Colwell stated that one day in the first week of August, 2012, Calabrese was on the telephone with Niraj. He told Colwell that Niraj "wanted him to go up near his parents' house . . . to rob a kid that owed him money" and that Niraj told Calabrese that he "would give him a good amount of money if he did this." Colwell stated that Calabrese was hesitant at first but later decided "he was gonna do it." Within a couple days of the telephone call with Niraj, Calabrese left their condominium, saying that "he was going to pick up [the defendant] to go up near his parents' house to go rob the kid." Colwell begged him not to go. As the evening went on and Colwell did not hear from Calabrese, she began calling him "a hundred times" and calling everyone he knew. When Colwell spoke with Calabrese later that evening, she asked him whether he did what he had to do, and Calabrese responded,

"yeah, but we didn't get any money. We just got a little bit of weed." When Calabrese returned to their condominium early the next morning, he was wearing different clothes and was not wearing shoes. He told Colwell he had been playing basketball at Niraj's house and that Niraj had given him a change of clothes.

1

### Federal Constitutional Claim

We begin by addressing the defendant's federal constitutional claim that his confrontation rights were violated by the introduction into evidence of the recording of Calabrese's statements to Early. He argues that Calabrese's statements were testimonial. We disagree with the defendant's claim, which is controlled by our recent decision in *State* v. *Patel*, supra, 186 Conn. App. 814.

"The sixth amendment to the United States constitution, applicable to the states through the fourteenth amendment, provides in relevant part: In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . . In *Crawford* v. *Washington*, [541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)], the [United States] Supreme Court substantially revised its approach to confrontation clause claims. Under *Crawford*, testimonial hearsay is admissible against a criminal defendant at trial only if the defendant had a prior opportunity for cross-examination and the witness is unavailable to testify at trial. . . . In adopting this categorical approach, the court overturned existing precedent that had applied an open-ended balancing [test] . . . conditioning the admissibility of out-of-court statements on a court's determination of whether the proffered statements bore adequate indicia of reliability. . . . Although *Crawford*'s revision of the court's confrontation clause jurisprudence is significant, its rules govern the admissibility only of certain classes of statements, namely, testimonial hearsay. . . . Accordingly, the threshold inquiries in a confrontation clause analysis are whether the statement was hearsay, and if so, whether the statement was testimonial in nature . . . . These are questions of law over which our review is plenary." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Walker*, supra, 332 Conn. 689–90.

"As a general matter, a testimonial statement is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact. . . . Although the United States Supreme Court did not provide a comprehensive definition of what constitutes a testimonial statement in *Crawford*, the court did describe three core classes of testimonial statements: [1] ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that

declarants would reasonably expect to be used prosecutorially . . . [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions [and] . . . [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . . The present case concerns only this third category form of testimonial statements.

"[I]n *Davis* v. *Washington*, [547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006)], the United States Supreme Court elaborated on the third category and applied a primary purpose test to distinguish testimonial from nontestimonial statements given to police officials, holding: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

"In *State* v. *Slater*, [285 Conn. 162, 172 n.8, 939 A.2d 1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008)], we reconciled *Crawford* and *Davis*, noting: We view the primary purpose gloss articulated in *Davis* as entirely consistent with *Crawford*'s focus on the reasonable expectation of the declarant. . . . [I]n focusing on the primary purpose of the communication, *Davis* provides a practical way to resolve what *Crawford* had identified as the crucial issue in determining whether out-of-court statements are testimonial, namely, whether the circumstances would lead an objective witness reasonably to believe that the statements would later be used in a prosecution." (Citations omitted; internal quotation marks omitted.) *State* v. *Walker*, supra, 332 Conn. 700–702.

Although arguing that the United States Supreme Court has yet to make an explicit post-*Crawford* ruling on this issue, the defendant recognizes that the court, in dicta, has expressed the view that "statements made unwittingly to a [g]overnment informant" or "statements from one prisoner to another" are "clearly nontestimonial." *Davis* v. *Washington*, supra, 547 U.S. 825 (citing *Bourjaily* v. *United States*, 483 U.S. 171, 181–84, 107 S. Ct. 2775, 97 L. Ed. 2d 144 [1987], and *Dutton* v. *Evans*, 400 U.S. 74, 87–89, 91 S. Ct. 210, 27 L. Ed. 2d 213 [1970] [plurality]). The defendant further concedes that "to date, federal and state courts have refused to accord 'testimonial' status to statements made to fellow inmates or informants."

This court, in resolving Niraj's appeal, noted that our Supreme Court had not "addressed the specific issue

of whether a recording initiated by a prisoner, who is acting as a confidential informant, of a fellow prisoner unwittingly making dual inculpatory statements about himself and a coconspirator or codefendant are testimonial in nature." *State* v. *Patel*, supra, 186 Conn. App. 837. Considering this question in the context of Calabrese's statements, this court concluded that his statements were nontestimonial in nature. Id. This court relied on *United States* v. *Saget*, 377 F.3d 223, 229 (2d Cir. 2004), cert. denied, 543 U.S. 1079, 125 S. Ct. 938, 160 L. Ed. 2d 821 (2005), in which the United States Court of Appeals for the Second Circuit concluded "that a declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford*" and decisions from other jurisdictions holding that statements to confidential jailhouse informants were not testimonial. See *State* v. *Patel*, supra, 840–41 (collecting cases).

We conclude that the resolution of the defendant's federal constitution claim is controlled by our decision in *State* v. *Patel*, supra, 186 Conn. App. 814, in which we concluded that Calabrese's statements "[bore] none of the characteristics of testimonial hearsay," in that "Calabrese made these statements to his prison cellmate in an informal setting. He implicated himself, [the defendant] and [Niraj] and there is no indication that he anticipated that his statements would be used in a criminal investigation or prosecution." Id., 841. *State* v. *Patel*, supra, 814, was released on January 8, 2019, after the briefing was completed in this case.[12] At oral argument before this court, the sole bases advanced by the defendant's appellate counsel for distinguishing *Patel* were differences in the evidence presented as to the circumstances preceding Early's agreement to record Calabrese.

The following additional background is relevant. In Niraj's trial, the court denied his motion in limine to preclude introduction into evidence of the Calabrese recording and noted that "the state claims that the conversations between Calabrese and the cellmate were initiated on September 3, 2013, without the involvement of law enforcement . . . ." Early testified, in that case, that "the intelligence officer asked me if I was—if I was willing to wear a device because I was ready—they don't want him because I'm trying to—I'm trying to dis on my plate, so, I say—I say, absolutely, I will. Know what I mean? He was in my cell. And I went to the officer and he started speaking; the next day, I went to the officer and said, he—he's talking about it; know what I mean? So, he put the device in my pocket—in my pocket and sent me back to the cell." On cross-examination, Early further testified that the night Calabrese was moved into his cell, he and Calabrese talked about their charges, and that the following day, Early went to security and said that he knew he could get Calabrese to talk.[13] In the present case, as described

previously, Early testified that he first was called to the intelligence office, informed that Calabrese was going to be placed in his cell, and asked whether he would be willing to wear a recording device to record Calabrese. The next day, when Early again was called to the intelligence office, he was put on a telephone call with the state police and was asked to get as many details as possible.

Accordingly, the evidence in the present case suggests that the recording was initiated by the Department of Correction, which fact was not clear from the testimony during Niraj's trial, and that the state police were involved and had spoken to Early, facts that were not in evidence during Niraj's trial. We are not convinced that factual discrepancies in Early's testimony as to whether it was Early or law enforcement officials who initiated the cooperation between the two disturbs our conclusion that Calabrese's statements were nontestimonial. The analysis regarding whether Calabrese's statements were testimonial focuses on the reasonable expectation of the declarant, Calabrese. Under either factual scenario, there is no indication that Calabrese had knowledge that he was speaking with a confidential jailhouse informant and, thus, an objective witness making statements under those circumstances would not reasonably believe that his statements later may be used at a trial. Accordingly, as this court previously concluded in *State* v. *Patel*, supra, 186 Conn. App. 841–42, Calabrese's statements to Early were nontestimonial, and the admission into evidence of the recording did not violate the defendant's right to confrontation under the federal constitution.

The defendant raises one additional argument not raised in *State* v. *Patel*, supra, 186 Conn. App. 814. The defendant claims that the court ran afoul of *Michigan* v. *Bryant*, 562 U.S. 344, 369–70, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011), in failing to give consideration to *Early*'s statements and actions during his conversation with Calabrese. He relies on *Bryant*'s direction that, "[i]n determining whether a declarant's statements are testimonial, courts should look to all of the relevant circumstances," such as "the statements and actions of all participants." Id. The state responds that "[w]hile the circumstances leading to a declarant making his hearsay statements can be relevant to whether they were testimonial, nothing about the circumstances here suggests that a person in Calabrese's 'position would intend his statements to be a substitute for trial testimony,' " quoting *Ohio* v. *Clark*,     U.S.    , 135 S. Ct. 2173, 2182, 192 L. Ed. 2d 306 (2015). The state directs this court's attention to post-*Bryant* decisions from the United States Court of Appeals for the Fourth and Fifth Circuits that have continued to engage in a declarant focused analysis. See *United States* v. *Dargan*, 738 F.3d 643, 650 (4th Cir. 2013) ("[t]he primary determinant of a statement's testimonial quality is whether a reasonable

person in the declarant's position would have expected his statements to be used at trial—that is, whether the declarant would have expected or intended to bear witness against another in a later proceeding" [internal quotation marks omitted]). In *Dargan*, the United States Court of Appeals for the Fourth Circuit held that jailhouse disclosures to a cellmate were plainly nontestimonial, where the statements were made to a casual acquaintance, his cellmate, in an informal setting, and were not made with an eye toward trial, where the declarant "had no plausible expectation of 'bearing witness' against anyone." Id., 651; see also *Brown* v. *Epps*, 686 F.3d 281, 287–88 (5th Cir. 2012) (noting, in post-*Bryant* decision, that "several district courts in this Circuit have held that statements unknowingly made to an undercover officer, confidential informant, or cooperating witness are not testimonial in nature because the statements are not made under circumstances which would lead an objective witness to reasonably believe that the statements would be available for later use at trial. Many other Circuits have come to the same conclusion, and none disagree" [footnote omitted; internal quotation marks omitted]). Considering these decisions in factually similar circumstances, we are not persuaded that the court erred in engaging in a declarant focused analysis.[14]

### 2

### State Constitutional Claim

For the first time, on appeal, the defendant argues that "[a]s an independent ground for relief, this court should conclude that Calabrese's statement was 'testimonial' for purposes of the due process and confrontation clauses in article first, § 8, of the Connecticut constitution." The defendant concedes that this issue is unpreserved, but nevertheless seeks review pursuant to the bypass doctrine set forth by our Supreme Court in *State* v. *Golding*, supra, 213 Conn. 239–40. We conclude that the record is adequate for review, and the defendant's claim, on its face, is of constitutional magnitude. The claim fails to satisfy the third prong of *Golding*, however, because the defendant has not established that a constitutional violation exists.

"In determining the contours of the protections provided by our state constitution, we employ a multifactor approach that we first adopted in [*State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992)]. The factors that we consider are (1) the text of the relevant constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of [the] constitutional [framers]; and (6) contemporary understandings of applicable economic and sociological norms [otherwise described as public policies]. . . . We have noted, however, that these factors may be inextricably interwoven, and not every [such]

factor is relevant in all cases." (Citations omitted; internal quotation marks omitted.) *State* v. *Skok*, 318 Conn. 699, 708, 122 A.3d 608 (2015).

At the outset, we conclude that five *Geisler* factors—the first through the fifth—do not support the defendant's claim that the admission into evidence of Calabrese's statements violated his rights under article first, § 8, and indeed, the defendant, in his principal brief to this court, concedes as much. Moreover, our Supreme Court has stated that "with respect to the right to confrontation within article first, § 8, of our state constitution, its language is nearly identical to the confrontation clause in the sixth amendment to the United States constitution. The provisions have a shared genesis in the common law. . . . Moreover, we have acknowledged that the principles of interpretation for applying these clauses are identical." (Citations omitted.) *State* v. *Lockhart*, 298 Conn. 537, 555, 4 A.3d 1176 (2010).

As to the sixth *Geisler* factor—contemporary economic and sociological considerations, including relevant public policy—the defendant argues that "[t]he Department of Correction should not serve as a Department of Interrogation." He argues: "This is a case in which . . . correctional officers . . . acting at the behest of [the] state police . . . purposely relocated a targeted inmate by moving him to a particular cell so that . . . a 'wired' informant could interrogate the targeted inmate and record the interrogation for later use in a criminal prosecution." He maintains that the law enforcement involved in planning the recording knew or should have known that "under existing law" the recording would likely be admissible at trial if the declarant were unavailable as a witness "and would thereby deprive any codefendant who had been implicated by the declarant of his or her right to confront their accuser." Citing prosecutorial discretion in the determination of the order in which cases are brought to trial, the defendant argues that "prosecutors can effectively manipulate the system to deprive defendants of their confrontation rights."

The state responds, inter alia, that "short of precluding the use of any taped recording of inmate to inmate communication, it is unclear how the defendant's proposed constitutional rule would work in practice. Yet, recording of inmate confessions should be encouraged, not forbidden, given the distrust with which our courts historically have viewed jailhouse informant testimony." We conclude that the defendant has not identified any compelling economic or sociological concern supporting a change in the interpretation of our confrontation clause and therefore conclude that the sixth *Geisler* factor does not lend support to the defendant's claim.

In light of the foregoing, we conclude that the admission into evidence of Calabrese's statements did not

violate the defendant's rights under article first, § 8, of the Connecticut constitution.

### 3

### Evidentiary Claim

The defendant also claims that the court abused its discretion when it concluded that Calabrese's statements to Early and Colwell were admissible as dual inculpatory statements pursuant to § 8-6 (4) of the Connecticut Code of Evidence. We disagree.

"A dual inculpatory statement is admissible as a statement against penal interest under § 8-6 (4) of the Connecticut Code of Evidence, which carves out an exception to the hearsay rule for an out-of-court statement made by an unavailable declarant if the statement at the time of its making . . . so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." (Internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 67, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006). "In short, the admissibility of a hearsay statement pursuant to § 8-6 (4) . . . is subject to a binary inquiry: (1) whether [the] statement . . . was against [the declarant's] penal interest and, if so, (2) whether the statement was sufficiently trustworthy." (Internal quotation marks omitted.) *State* v. *Bonds*, 172 Conn. App. 108, 117, 158 A.3d 826, cert. denied, 326 Conn. 907, 163 A.3d 1206 (2017). The defendant concedes that Calabrese's statements to Early and Colwell were against his penal interest and challenges only the court's finding that the statements were trustworthy.

"In determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest. . . . Conn. Code Evid. § 8-6 (4). Additionally, when evaluating a statement against penal interest, the trial court must carefully weigh all of the relevant factors in determining whether the statement bears sufficient indicia of reliability to warrant its admission. . . . [W]hen viewing this issue through an evidentiary lens, we examine whether the trial court properly exercised its discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Pierre*, supra, 277 Conn. 68; see also *State* v. *Bonds*, supra, 172 Conn. App. 123 ("[w]e review for an abuse of discretion the court's determination that the statement was trustworthy and, thus, admissible at trial"). "[N]o single factor for determining trustworthiness . . . is necessarily conclusive. . . . Rather, the trial court is tasked with weighing all of the relevant factors set forth in § 8-6

(4) . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Bonds*, supra, 125.

The defendant argues that Calabrese's statements to Early were not trustworthy. With respect to the first factor, the defendant argues that statements to fellow inmates traditionally have been considered untrustworthy, Calabrese and Early did not know each other, and most of Calabrese's statements were prompted and induced by Early's questioning.[15] We disagree that this factor weighs against a finding of reliability. The court found relevant that Calabrese made the statements "to a fellow inmate who appeared to . . . be a fellow gang member, and one who was facing serious charges."[16] In *State* v. *Smith*, 289 Conn. 598, 633, 960 A.2d 993 (2008), our Supreme Court concluded that the trial court's findings adequately supported its conclusion that a witness' statements to his cellmate, in which he implicated himself in an unsolved murder, presented sufficient indicia of reliability to justify their admission, noting "the camaraderie that arises" between those who are incarcerated and facing criminal charges. Id. The court in *Smith* also considered that the witness "did not induce [the declarant] to share the details of the crime." Id. It noted the trial court's finding that although "at times [the witness] seemed to lead some of the discussion," the declarant was "a willing and active participant . . . who provided nearly all of the substance of the discussion." (Internal quotation marks omitted.) Id., 616–17. In the present case, although Early continually asked Calabrese questions, Early testified that he did not know anything about the crime before talking to Calabrese. Thus, the details of the crime were related only by Calabrese. Accordingly, the person to whom the statements were made weighs in favor of a finding of trustworthiness.

As to the second factor, the defendant recognizes that Calabrese recited "specific details of the crime" but contends that his statements also "contained numerous facts that were contradicted by his other statements or by physical evidence." Specifically, he emphasizes that Calabrese told Early that Vitalis had come at him with a large knife, but there was no evidence of any knife. Rather than setting forth and analyzing the remainder of the alleged inconsistencies, the defendant merely "incorporates . . . the list of contradictory and inconsistent statements listed in the trial memoranda filed by Niraj . . . and the defendant." (Citation omitted.) It was within the trial court's discretion to evaluate the consistencies and inconsistencies to conclude that, on balance, the second factor weighed in favor of a determination that the statements are reliable. Indeed, the trial court noted the inconsistencies identified by the defendant and found that they "pale[d] in comparison to the myriad details of the crime that could only be known to a participant in the crime." Accordingly, our examination of the relevant factors[17] leads us to con-

clude that the trial court's findings adequately support its conclusion that Calabrese's statements to Early presented sufficient indicia of reliability to justify their admission. See *State* v. *Smith*, supra, 289 Conn. 631.

The defendant also argues that Calabrese's statements to Colwell were not trustworthy because he "was seeking to misinform his girlfriend about his involvement in the incident; he downplayed his participation, admitting to the robbery but denying involvement in the death of . . . Vitalis. He even told Early that he had lied to Colwell." The state responds that Calabrese actually had not denied killing Vitalis in his statement hours after the murder, and that "Calabrese's statement about "rob[bing] the kid," made before the incident, was not inconsistent with the state's theory, which allowed for the possibility that the gunman's intent to kill may have been formed moments before the actual murder."

With regard to the first factor, Calabrese made his statements to Colwell on the day of the crime, both when he was leaving their condominium to commit the crime and later that night after having committed the crime. "In general, declarations made soon after the crime suggest more reliability than those made after a lapse of time where a declarant has a more ample opportunity for reflection and contrivance." (Internal quotation marks omitted.) *State* v. *Camacho*, 282 Conn. 328, 361, 924 A.2d 99 (statements made within one week of murders trustworthy), cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d. 273 (2007); see *State* v. *Pierre*, supra, 277 Conn. 71 (statements made within "couple of weeks" trustworthy). The statements also were made to Calabrese's girlfriend, a person with whom Calabrese had a close relationship. See *State* v. *Camacho*, supra, 361–62 (statement made to neighbor, who was also friend, indicative of statement's reliability). As to the second factor, the statements were consistent with other evidence in the case, in that Calabrese told Colwell they "didn't get any money," which was consistent with the police, upon conducting a search, finding $32,150 in Vitalis' bedroom. As to the third factor, even if Calabrese downplayed his involvement by admitting that he robbed Vitalis while failing to offer that he also had murdered Vitalis, the statement remained against his penal interest to a significant extent, in that he "directly and explicitly incriminated himself by admitting his own participation in" the robbery. *State* v. *Bonds*, supra, 172 Conn. App. 123. Thus, the trial court's findings adequately support its conclusion that Calabrese's statements to Colwell presented sufficient indicia of reliability to justify their admission. See *State* v. *Smith*, supra, 289 Conn. 631.

In light of the preceding factors, we conclude that the court did not abuse its discretion when it admitted Calabrese's statements to Early and Colwell pursuant

to the dual inculpatory statement exception to the hearsay rule.

## II

The defendant's second claim on appeal is that the "court erred in ruling that the defense could not elicit testimony from Salony [Majmudar], the defendant's sister, that Shyam had confessed to her that it was he, not the defendant, who had accompanied Calabrese into the Vitalis home on August 6." He claims that the exclusion of Majmudar's testimony regarding Shyam's statement constituted evidentiary error under § 8-6 (4) of the Connecticut Code of Evidence, and violated his federal and state constitutional rights to present a defense and to due process of law. We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. On January 25, 2017, Majmudar, the defendant's sister, testified that Shyam visited her home unannounced one evening during the last two weeks of September, 2013. When defense counsel sought to elicit the substance of the conversation, the state asked for a proffer outside the presence of the jury. The jury was excused, and Majmudar testified that Shyam asked to borrow $50,000 to help make Niraj's bond. Majmudar testified that she told Shyam that she could not help him because she needed to have money ready for the defendant's bond and attorney's fees. Majmudar testified: "I told him that [the defendant] didn't do this, that [the defendant] was innocent, he was in Boston with me. He didn't look surprised. I asked him if he knew who was with [Calabrese] during the robbery. He stayed silent, and he avoided making eye contact with me. I asked him again if he knew who was with [Calabrese] during the robbery, and he still stayed silent and looked away. I directly asked him if he was with [Calabrese] during the robbery. That's when he started to break down in tears, and he admitted that he and [Calabrese] tried to rob [Vitalis] that night."[18] Majmudar testified that she told only the defendant about Shyam's confession.

The following morning, the court heard argument on the issue of whether Shyam's statements to Majmudar were admissible as statements against penal interest under § 8-6 (4) of the Connecticut Code of Evidence. Analyzing the trustworthiness of the statements, the court considered a number of factors that it determined weighed against admissibility, including that the confession was made thirteen months after the crime; the witness, Majmudar, told no one other than the defendant for more than three and one-half years after the statement was made; the statements were made to only one person, Majmudar; the nature of the relationship between Majmudar and Shyam, in that she had only seen Shyam approximately twice in the preceding year or so; and Majmudar was highly motivated to assist her brother. The court concluded that there was insufficient

evidence corroborating the statement to render it trustworthy and, therefore, the statement did not satisfy the requirements of § 8-6 (4).[19]

As set forth in part I B 3 of this opinion, we review for an abuse of discretion the court's determination of the trustworthiness of a statement against penal interest. See *State* v. *Pierre*, supra, 277 Conn. 68. "In determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest. . . . Conn. Code Evid. § 8-6 (4)." (Citation omitted; internal quotation marks omitted.) *State* v. *Pierre*, supra, 68.

We begin with the third factor, pursuant to which the defendant argues that "there is no question that Shyam's statement was against penal interest." The court described Shyam's statement as being "to the effect that he should be charged with murder instead of the defendant." We agree with the defendant that the statement was against Shyam's penal interest to a significant extent, such that this factor weighs in favor of a finding of trustworthiness.

As to the first factor, the defendant argues on appeal that Shyam's statement was trustworthy in that it was made to "someone with whom he had a close personal relationship, and with whose family he had resided for two years while in high school." We cannot conclude that the court erred in determining that the relationship between Majmudar and Shyam did not support a finding of trustworthiness.[20] Although Majmudar testified that Shyam had shared confidences with her, that she and Shyam were close growing up, and that the two grew even closer when Shyam stayed with her family for his junior and senior years of high school, she acknowledged that she did not see him as much as she did before medical school and residency. She also testified that she had seen Shyam only twice in the past year or so and that it had "been years" since she had more steady contact with Shyam.[21] Moreover, there was no evidence presented that Shyam ever had repeated the statement or had made inculpatory statements to persons other than Majmudar. See *State* v. *Rivera*, 221 Conn. 58, 70, 602 A.2d 571 (1992) (considering that there was no evidence declarant repeated statement to anyone else and testified to the contrary at probable cause hearing); *State* v. *Mayette*, 204 Conn. 571, 578, 529 A.2d 673 (1987) (delay in making statements combined with lack of reiteration of statements weigh against reliability); see also *State* v. *Lopez*, 254 Conn. 309, 321, 757 A.2d 542 (2000) (considering, under second factor, that there was no evidence declarant had repeated statement or made inculpatory statements to any other

person).

As to the second factor, the defendant argues that Shyam's statement was supported by a number of corroborating circumstances. First, he points to Vitalis' mother's indication, at one point, that Shyam was one of the intruders. Although Vitalis' mother did not testify at trial, a joint stipulation signed by the prosecutor, Dawn Gallo, and the defendant, by defense counsel, William F. Dow III, was entered into evidence and read aloud to the jury. The joint stipulation provided, in relevant part, that Vitalis' mother gave multiple statements with different descriptions of the intruders, first stating that both men were white and later stating that they could have been Hispanic. In January, 2016, Vitalis' mother told an inspector with the state's attorney's office that she believed one of the two men was an Indian male and that she believed this person to be Shyam Patel. At the time of the incident, she knew Niraj and Shyam, but did not know the defendant. In January, 2017, Vitalis' mother told an inspector that she did not know who either of the two intruders were for certain. Because the statements of Vitalis' mother were inconsistent with each other, they are not sufficiently corroborative of Shyam's statement.

Second, the defendant argues that "[t]here was no irrefutable proof that Shyam was at some distant location at the time of the crime, so he clearly had the opportunity to participate in it." In support of this argument, he cites *State* v. *Gold*, 180 Conn. 619, 636, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980), in which our Supreme Court noted that the declarant had the opportunity to commit the murders, citing, as corroborating circumstances, that two witnesses had testified during the defendant's offer of proof that the declarant was in the state on the day of the murders and was absent from his home at the approximate time of the crimes. No such testimony existed in the present case, and the *lack* of proof that Shyam was at a distant location is not necessarily corroborative of Shyam's statement.

The defendant further argues that Shyam's statement is corroborated by his access to the Pathfinder after the crime, evidence suggesting that it was he who had the car cleaned,[22] and searches he conducted online for information about criminal penalties.[23] Although this evidence may "reinforce the idea of his active criminal involvement," as the defendant argues, these circumstances do not necessarily corroborate the key portion of Shyam's statement that he entered Vitalis' home with Calabrese but, rather, they suggest merely that he was involved in the crime to some degree.

The defendant further suggests that "the court's admissibility ruling was based in part on an improper consideration, i.e., the court's own opinion as to the credibility of Shyam's statement against penal interest."

(Emphasis omitted.) He cites the court's remarks that the evidence pointed "more to Michael Calabrese and this defendant than it does to Shyam Patel having been the person to enter the Vitalis home. The circumstances surrounding the event are far more consistent with this defendant entering the Vitalis' home than Shyam Patel entering that home." (Emphasis omitted.) We are not persuaded that the challenged remarks demonstrate that the court exceeded its gatekeeping function in determining whether Shyam's statements were sufficiently trustworthy to be admitted into evidence. The court referenced defense counsel's point "that it is important to not confuse the issue of credibility with admissibility," and stated that it was "fully cognizant of that" and "kept that in mind . . . in making [its] ruling . . . ."

On the basis of the foregoing, we conclude that the court did not abuse its discretion by excluding from evidence Majmudar's testimony as to Shyam's statement because it was not trustworthy and, therefore, did not satisfy the requirements of § 8-6 (4).[24]

### III

The defendant's third claim on appeal is that "[t]he court erred when it denied the defendant's motion to preclude 'cellular telephone tower evidence'—more formally known as 'historical cell[ular] site location information (CSLI)'—and refused to require the state to demonstrate the reliability of such evidence at a hearing held pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998)." (Footnote omitted.) We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. Again, our analysis of this issue requires discussion of filings and testimony in Niraj's trial. See footnote 9 of this opinion. In Niraj's trial, Niraj filed a motion to preclude the state from introducing "cellular telephone tower evidence or, in the alternative, that the state be required to demonstrate the evidence's reliability at a hearing pursuant to *Porter*." The court held a hearing on the motion on December 23, 2015. Noting the many ways in which cell tower technology has been used, the court stated that "it would seem to me that it would make sense to hear from the witness whom the state would offer at trial. I'm not turning this into deposition, I'm not turning this into a *Porter* hearing, but . . . th[e] first question is whether this is an innovative scientific technique. That's the first question. If what is being offered is something that's been used uncritically for ten years that's one thing, if no one has ever used this type of evidence anywhere then we might need a *Porter* hearing." Defense counsel then stated that the innovative scientific technique he sought to challenge was the theory that the cell phone "must hit the closest tower."

The state then presented the testimony of Special Agent James J. Wines of the Federal Bureau of Investigation (FBI) and a member of its Cellular Analysis Survey Team (CAST), whose responsibilities as a CAST member included "analyz[ing] records obtained by law enforcement agencies related to specific crimes and then using those records [to] conduct an analysis using cell tower information as to the approximate location of a cell phone at a particular time." Wines testified that CAST members have testified in hundreds of federal and state trials. As to Wines' personal experience, he stated that he has used historical call detail records with cell site information since 2003, spent "thousands of hours reviewing call detail records," and has used that information "to locate subjects in [his] investigations, to locate and apprehend fugitives, to assist in the recovery of evidence, to locate victims of child prostitution, a variety of different . . . scenarios." Wines explained that his reports and presentations are subject to internal peer review, usually by a more senior member of CAST, who reviews his analysis for accuracy and completeness. Wines testified that in his experience, "the individual or the phone has always been in the area where the call detail records indicated the phone would be."

Wines testified that cell phone providers use call detail records for a number of purposes, including "for billing records, so that they can accurately bill their customers for the amount of network resources that their customers use, and they also use it to assist in optimizing the network to provide the best possible coverage for their . . . customers." Wines stated that cell phone carriers "are constantly trying to ensure the reliability and the quality of their networks so that they don't lose customers." Wines testified that he had received training from AT&T, Verizon, Sprint, and T-Mobile, the four major cell phone providers that provide cell phone service in Connecticut, and that he maintains regular contact with their "legal compliance people as well as engineers" regarding "how their call detail records are populated and maintained as well as how their networks are optimized."

In the present case, Wines analyzed the movement of cell phones associated with Niraj, Calabrese, and the defendant on August 6, 2012. He plotted the cell towers each phone utilized, which showed "the movement of two phones [associated with Niraj] coming up from the area of Queens, New York, to the area of Sharon, Connecticut, and . . . two other phones [associated with Calabrese and the defendant] moving up from the area of Branford, Connecticut, down on the shoreline, again, up to the area of Sharon, Connecticut. And while these phones are moving they're often in contact with one another as they proceed north."

With respect to the towers accessed by the cell phone

associated with the defendant on August 6, 2012, Wines explained that prior to 6:04 p.m., the phone accessed tower 1025, which is located on the top of Mohawk Mountain, for a series of phone calls. Wines testified that there were no outgoing calls or messages from the cell phone associated with the defendant after 6:04 p.m. on August 6, 2012, which, he observed, indicated "either that the phone was off or that it was . . . in an area where it could not receive any cell signal," or that "something could have happened to the phone that rendered it unable" to receive a cellular signal.

Wines explained that he had used an AT&T engineering phone[25] and had "detected energy from tower 1025" in the front yard and inside Vitalis' home on a staircase. This meant that were the engineering phone to make a call, "it would have utilized resources from tower 1025." Wines performed this test once. Wines stated that tower 1025 was not the closest tower to the Vitalis residence and explained why a cell phone might use a tower other than the closest tower. Wines stated that a cell phone is "constantly evaluating its network, and it's scanning the area and determining the strength and clarity of the signals it's receiving from the cell towers in the area. And in doing that analysis it is looking for the strongest, cleanest signal, and that's the tower that it's going to select when it requests resources to make or receive a call or make or receive a text message. The factors that can affect the strength and clarity can be terrain features, can be obstructions, can be the way that the antennas are oriented—the downtilt of particular antennas. In driving in this area in preparing my analysis, what I did note that it is an extremely hilly area, and there are significant terrain features, peaks and valleys that could affect the strength of signal coming from towers, which could cause a phone to select a tower that would not necessarily be the closest tower, but would be the strongest, clearest signal." Wines testified that tower 1025 is between seven and eight miles from the crime scene and that the tower likely had a maximum range of eight miles, which would cover approximately 200 square miles.[26]

Wines further testified that "when a cell phone selects a cell tower, it has to be within the RF [radio frequency] footprint of that particular tower in order to request resources from that tower to complete either a call or an SMS [short message service] message" and, therefore, his analysis also can show where a cell phone was not located. Wines acknowledged that cell towers provide 360 degree coverage and that they are often broken down into sectors. Wines stated that because he "was simply trying to show movement over . . . a large area," he did not "break it down into sectors" and that he conducted his analysis "simply using the towers."

Wines testified that the tower a cell phone utilizes is

recorded automatically and electronically in the call details records, and that he was not aware of any situation in which a cell tower site noted in a call detail record was incorrect. Although he had never seen a study from outside law enforcement in which the methodology was tested, he stated that "it's tested in a practical, real world sense every day when myself and other members of my unit find fugitives, recover evidence, recover kidnap victims that it's—it works."

Following Wines' testimony, the court heard argument on Niraj's motion in limine. The court then ruled that the evidence offered did not involve an innovative scientific technique and, therefore, a *Porter* hearing was not appropriate. It further stated that "[e]ven if a hearing were warranted and the findings I just made and all the findings I make are based on the evidence presented by this witness, the objection to the technique does not succeed. The evidence offered is scientifically valid; it's rooted in the methods of procedures of science. It is far more than a subjective belief or unsupported speculation; it is therefore sufficiently reliable to be admitted into evidence." The court based its findings "not only on the testimony of the witness in general, but in particular the witness' long experience in this type of analysis, the nature of the evidence that's being offered, the experience of other experts who carry out similar work, the fact that this witness has had significant training and experience in this area, and that his findings are reviewed by other experts in the same field." The court noted Niraj's objection to Wines' methodology but stated that it "did not hear an argument from the defendant as to an alternate methodology that should have been used in this case, nor is there any evidence, offered by the defendant, by any other expert in this field that some other methodology should have been used." Last, the court found the evidence relevant "in that it purports to show the movement of parties allegedly connected with the homicide . . . on or about the date and time of the homicide . . . ."

In the present case, the defendant filed a motion in limine and memorandum of law in support thereof that virtually was identical to those filed by Niraj. The court heard argument on the motion on November 8, 2016. Defense counsel agreed with the court that his motion paralleled that filed in Niraj's case. Noting that it had ruled on the motion in Niraj's case from the bench on December 23, 2015, and that its ruling was "based upon the testimony provided . . . at a hearing, specifically, testimony by agent Wines," the court inquired of defense counsel whether there were "any changes in the law or factual developments that would cause me to reconsider that ruling." Defense counsel responded: "None that I'm aware of, Your Honor." The court then stated: "[F]or the reasons stated with regard to the Calabrese statement motion, I will deny this motion as well, pursuant to the law of the case.[27] And that's based

upon, in part, the representations made by the defense this morning that there are no material factual changes or changes in the law that would warrant a different result. And so the motion in limine to preclude admission of cellular telephone tower evidence is denied." (Footnote added.)

At trial, Wines testified as to the movement of cell phones associated with Niraj, and one cell phone each associated with Shyam, the defendant, and Calabrese over the course of August 6, 2012, and the state introduced into evidence three PowerPoint presentations depicting the movement of those phones to and from the Sharon area, movement in the Sharon area on the afternoon and evening of August 6, 2012, and the activity of cell phones associated with the defendant's family members. Wines testified that from 3:57 p.m. through 6:04 p.m. on August 6, 2012, all activity on the cell phone associated with the defendant utilized tower 1025, which Wines' engineering phone had detected as the "strongest, highest quality signal" at the crime scene and which an AT&T drive test conducted two and one-half weeks prior to the crime "along route 4 approximately two and a quarter to two and a half miles southeast of the crime scene also detect[ed] signal from tower 1025 as being the strongest, highest quality signal in that area."

In his February 6, 2017 motion for a new trial, the defendant claimed that the court, without requiring a sufficient showing of reliability, improperly admitted evidence "purporting to establish instances of mobile telephone communications between the defendant and other accused parties as well as their whereabouts and movements . . . ." The state objected, arguing that the court properly admitted the evidence "after having held a *Porter* hearing in *State* v. [*Patel*, supra, 186 Conn. App. 814], then again hearing argument in [this case], which incorporated by agreement of the parties the evidence and argument presented in *State* v. [*Patel*, supra, 814]." The court denied the motion on April 28, 2017.

In a supplemental written ruling issued on June 20, 2017, the court addressed our Supreme Court's decision, released following the jury's verdict in the present case, in *State* v. *Edwards*, 325 Conn. 97, 133, 156 A.3d 506 (2017), which held that the trial court improperly admitted testimony and documentary evidence of historic cell site analysis, including cell tower coverage maps, through a detective without qualifying him as an expert and conducting a *Porter* hearing in order to ensure that his testimony was based on reliable scientific methodology. The court in *Edwards* relied on the approach by the United States District Court for the District of Connecticut in *United States* v. *Mack*, Docket No. 3:13-cr-00054 (MPS), 2014 WL 6474329 (D. Conn. November 19, 2014), in which the court conducted a

hearing pursuant to *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and concluded that the FBI agent's methodology was sufficiently reliable to meet the requirements of *Daubert* and, therefore, the agent could testify regarding his conclusions.

The court in the present case stated that "the state presented an expert witness with qualifications equal to those of the witness who testified in *Mack,* as opposed to the limited qualifications of the state's witness in *Edwards.*" The court explained that Wines demonstrated in detail the methodology that he used in completing his analysis. The court stated: "More significantly, even though this court found that a *Porter* hearing was not required relative to the cell tower data analysis, it effectively carried out a *Porter* hearing out of the presence of the jury in the proceeding against Niraj and concluded that, even if a *Porter* hearing was required, the evidence proffered by the state was scientifically valid in that it was rooted in the methods and procedures of science. Thus, this court made the findings that were lacking in *Edwards* and that the District Court did make in *Mack.*"[28]

On appeal, the defendant argues that "[t]his court should not countenance the trial court's attempt, in its June 20, 2017 ruling, to retroactively 'reclassify' the offer of proof at Niraj's trial as 'effectively' constituting a *Porter* hearing." The state responds that the court "conducted the functional equivalent of a *Porter* hearing and, most importantly, made the findings required by *Porter.*" We agree with the state that the court held the functional equivalent of a *Porter* hearing.

"In *Porter,* we followed the United States Supreme Court's decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* [supra, 509 U.S. 579], and held that testimony based on scientific evidence should be subjected to a flexible test to determine the reliability of methods used to reach a particular conclusion. . . . A *Porter* analysis involves a two part inquiry that assesses the reliability and relevance of the witness' methods. . . . First, the party offering the expert testimony must show that the expert's methods for reaching his conclusion are reliable. A nonexhaustive list of factors for the court to consider include: general acceptance in the relevant scientific community; whether the methodology underlying the scientific evidence has been tested and subjected to peer review; the known or potential rate of error; the prestige and background of the expert witness supporting the evidence; the extent to which the technique at issue relies [on] subjective judgments made by the expert rather than on objectively verifiable criteria; whether the expert can present and explain the data and methodology underlying the testimony in a manner that assists the jury in drawing conclusions therefrom; and whether the technique or methodology was devel-

oped solely for purposes of litigation. . . . Second, the proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract. . . . Put another way, the proponent of scientific evidence must establish that the specific scientific testimony at issue is, in fact, derived from and based [on] . . . [scientifically reliable] methodology." (Internal quotation marks omitted.) *State* v. *Edwards*, supra, 325 Conn. 124.

"[I]t is well established that [t]he trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. . . . [Accordingly] [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Because a trial court's ruling under *Porter* involves the admissibility of evidence, we review that ruling on appeal for an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Montanez*, 185 Conn. App. 589, 619, 197 A.3d 959 (2018), cert. denied, 332 Conn. 907, 209 A.3d 643 (2019).

We first consider whether the hearing conducted in Niraj's case was, in substance, a *Porter* hearing. Our review of the transcript reveals that there was ample testimony before the court bearing on the relevant *Porter* factors and that there was sufficient testimony to enable the court to determine whether Wines' methods were reliable. Specifically, Wines testified, inter alia, that, although he had not seen a study from outside law enforcement that tested his methodology, "it's tested in a practical, real world sense" when CAST members find fugitives and recover kidnap victims and evidence, his work is subject to an internal peer review process where another CAST member reviews his analysis for accuracy and completeness, his personal experience with the accuracy of the technology was such that "the individual or the phone has always been in the area where the call detail records indicated the phone would be," he has had personal experience using historical call detail records with cell site information since 2003 and has received training from the major cell phone providers; and the technology was developed for a number of purposes, including to assist cell phone carriers in optimizing their networks to provide the best possible coverage for their customers.

The defendant contends, however, that the court "did not make adequate *Porter* findings . . . ."[29] Specifically, he argues that the court's ruling failed to address "the known or potential rate of error" and the "peer review" factor. (Internal quotation marks omitted.) Although the court did not use the words "rate of error" or "peer review," it expressly relied on "the experience of other experts who carry out similar work" and noted that Wines' "findings are reviewed by other experts in the same field," both appropriate considerations under the flexible *Porter* test. See *United States* v. *Mack*,

supra, 2014 WL 6474329, *4 (citing testimony that estimation procedures "are commonly relied upon by law enforcement and the cell phone industry when more precise methods of estimation are unavailable" and noting that CAST member had testified that, "in his experience, it is an unusual case in which the actual coverage area of a cell tower differs greatly from the estimation derived from this method"). Last, we note that each of these factors is "only one of several nonexclusive factors . . . . No single *Porter* factor is dispositive." (Internal quotation marks omitted.) *State* v. *Montanez*, supra, 185 Conn. App. 620–21.

Moreover, the court in *Mack* found that the CAST member's inability to provide a precise numerical error rate in the context of estimating the coverage area of cell towers did not negate his qualitative testimony, nor did the lack of scientific peer review render his methods unreliable. *United States* v. *Mack*, supra, 2014 WL 6474329, *4; see also *State* v. *Montanez*, supra, 185 Conn. App. 621 (noting, in context of determining coverage areas of particular towers through drive test analysis, that certain federal courts have declined to find drive test data unreliable on basis of lack of scientific testing and publications).

Last, the defendant contends that "the most fundamental omission is the court's failure to consider the absence of 'sector' analysis and how that absence affected Wines' ability to provide objective rather than subjective data." Specifically, he emphasizes that "[t]he absence of sector analysis means that Wines' calculations and conclusions were less precise and less accurate than they would have been with a sector-based analysis." As the defendant recognizes, defense counsel in Niraj's trial conceded that Niraj, whose alibi was that he was at his parents' house in Warren, was within the radius of coverage of tower 1025. The defendant in the present case states that he "did not make any such concession." Indeed, the defendant's alibi in the present case was that he was at Majmudar's house in Boston, plainly outside of tower 1025's uncontested coverage area of 200 square miles.[30] When the court in the present case asked whether there were any factual developments that would cause it to reconsider the ruling rendered in Niraj's case, defense counsel did not identify his *out-of-state alibi* as a factual distinction requiring reconsideration. Nor does he explain in his appellate brief how the greater precision of a sector analysis would be more reliable, where the state, in light of the defendant's alibi that he was in Boston, sought only to identify the general area in which his phone was present.

Accordingly, the defendant has not demonstrated that the court abused its discretion in denying his motion to preclude CSLI evidence.

IV

The defendant's final claim on appeal is that there was insufficient evidence to convict him of murder predicated on *Pinkerton* liability. The defendant acknowledges that he "actively participated in the planned burglary and robbery" but argues that "there is no evidence that he or any [coconspirator] ever contemplated the death of [Vitalis]." He further argues that his "participation in the conspiracy and Calabrese's murder of [Vitalis] was so attenuated or remote . . . that it would be unjust to hold the defendant responsible for the criminal conduct of his coconspirator." (Internal quotation marks omitted.) We disagree.

We first set forth our standard of review. "The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . In conducting our review, we are mindful that the finding of facts, the gauging of witness credibility and the choosing among competing inferences are functions within the exclusive province of the jury, and, therefore, we must afford those determinations great deference." (Internal quotation marks omitted.) *State* v. *Leggett*, 94 Conn. App. 392, 398, 892 A.2d 1000, cert. denied, 278 Conn. 911, 899 A.2d 39 (2006).

We next set forth the scope of *Pinkerton* liability. "Under the *Pinkerton* doctrine . . . a conspirator may be held liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy. . . . The rationale for the principle is that, when the conspirator [has] played a necessary part in setting in motion a discrete course of criminal conduct, he should be held responsible, within appropriate limits, for the crimes committed as a natural and probable result of that course of conduct. . . . [W]here . . . the defendant was a full partner in the illicit venture and the coconspirator conduct for which the state has sought to hold him responsible was integral to the achievement of the conspiracy's objectives, the defendant cannot reasonably complain that it is unfair to hold him vicariously liable, under the *Pinkerton* doctrine, for such criminal conduct. . . .

"In analyzing vicarious liability under the *Pinkerton* doctrine, we have stated that the *Pinkerton* doctrine constitutionally may be, and, as a matter of state policy, should be, applied in cases in which the defendant did

not have the level of intent required by the substantive offense with which he was charged. The rationale for the doctrine is to deter collective criminal agreement and to protect the public from its inherent dangers by holding conspirators responsible for the natural and probable—not just the intended—results of their conspiracy. . . . This court previously has recognized that [c]ombination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed. In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise. . . . In other words, one natural and probable result of a criminal conspiracy is the commission of originally unintended crimes. . . . Indeed, we specifically have contrasted *Pinkerton* liability, which is predicated on an agreement to participate in the conspiracy, and requires the substantive offense to be a reasonably foreseeable product of that conspiracy . . . with accessorial liability, which requires the defendant to have the specific mental state required for the commission of the substantive crime. . . .

"Thus, the focus in determining whether a defendant is liable under the *Pinkerton* doctrine is whether the coconspirator's commission of the subsequent crime was *reasonably foreseeable*, and not whether the defendant could or did *intend* for that particular crime to be committed. In other words, the only mental states that are relevant with respect to *Pinkerton* liability are that of the defendant in relation to the conspiracy itself, and that of the coconspirator in relation to the offense charged. If the state can prove that the *coconspirator's* conduct and mental state satisfied each of the elements of the subsequent crime at the time that the crime was committed, then the defendant may be held liable for the commission of that crime under the *Pinkerton* doctrine if it was reasonably foreseeable that the coconspirator would commit that crime within the scope of and in furtherance of the conspiracy." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Coward*, 292 Conn. 296, 307–309, 972 A.2d 691 (2009).

Accordingly, "[u]nder the *Pinkerton* doctrine . . . a defendant may not be convicted of murder *unless one of his criminal associates*, acting foreseeably and in furtherance of the conspiracy, caused the victim's death with the intent to do so. . . . [U]nder *Pinkerton*, a coconspirator's intent to kill may be imputed to a defendant who does not share that intent, provided, of course, that the nexus between the defendant's role and his coconspirator's conduct was not so attenuated or remote . . . that it would be unjust to hold the defendant responsible . . . ." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Coltherst*, 263 Conn. 478, 494, 820 A.2d 1024 (2003).

Our Supreme Court has acknowledged, however, that "there may be occasions when it would be unreasonable to hold a defendant criminally liable for offenses committed by his coconspirators even though the state has demonstrated technical compliance with the *Pinkerton* rule. . . . For example, a factual scenario may be envisioned in which the nexus between the defendant's role in the conspiracy and the illegal conduct of a coconspirator is so attenuated or remote, notwithstanding the fact that the latter's actions were a natural consequence of the unlawful agreement, that it would be unjust to hold the defendant responsible for the criminal conduct of his coconspirator. In such a case, a *Pinkerton* charge would not be appropriate." (Internal quotation marks omitted.) Id., 493.

The defendant cursorily maintains that Vitalis' murder was not reasonably foreseeable. We disagree. Giving deference, as we must, to the reasonable inferences of the jury, it reasonably was foreseeable that Vitalis, who was home with his mother at the time of the crime, might resist or fight back to thwart the robbery of his proceeds from a large drug sale, and that the defendant's coconspirator, Calabrese, who was armed with a loaded gun, might, in furtherance of the conspiracy, cause Vitalis' death with the intent to do so. See *State* v. *Coward*, supra, 292 Conn. 312 (quoting *State* v. *Rossi*, 132 Conn. 39, 44, 42 A.2d 354 [1945], for proposition that "crimes against the person like robbery . . . are, in common experience, likely to involve danger to life in the event of resistance by the victim or the attempt of the perpetrator to make good his escape and conceal his identity"); *State* v. *Taylor*, 177 Conn. App. 18, 33, 171 A.3d 1061 (2017) (Sufficient evidence to support the defendant's conviction of murder under the *Pinkerton* doctrine existed where the "court reasonably found, on the basis of the evidence presented and the reasonable inferences drawn therefrom, that the defendant and [his alleged coconspirator] robbed the victim, who fought back, and that they did so in furtherance of an agreement to commit a robbery while at least one of them was armed with a deadly weapon. Because the murder of the victim was committed in furtherance of that conspiracy, and was a reasonably foreseeable consequence thereof, such proof of conspiracy also supported the defendant's conviction for murder under the *Pinkerton* doctrine."), cert. denied, 327 Conn. 998, 176 A.3d 555 (2018); see also *State* v. *Gonzalez*, 311 Conn. 408, 427, 87 A.3d 1101 (2014) (noting that had the state sought to prove the defendant's liability for manslaughter in the first degree with a firearm under *Pinkerton*, evidence that the defendant possessed a loaded gun when he was together with an individual selling drugs "could well have been probative circumstantial evidence of the existence of a conspiracy between them to sell drugs at [the housing complex], of which the death of an interfering party could be a foreseeable,

natural, and probable consequence").

Moreover, we disagree that the defendant's role was too attenuated, such that it would be unfair to apply *Pinkerton*. Viewing the evidence in the light most favorable to sustaining the verdict, the defendant communicated with Niraj via text message regarding the crime days prior to it. The defendant, presumably aware, as was Calabrese, that Vitalis was a drug dealer who recently received a large amount of cash from a drug sale, planned to enter Vitalis' home to rob him of that money. Moreover, before the defendant and Calabrese entered the home, they saw Vitalis' mother arrive home. Once inside, the defendant restrained her using zip ties. Cf. *State* v. *Coward*, supra, 292 Conn. 311 (considering, among other evidence, that the "plan called for [the defendant's coconspirator] and the defendant to invade an occupied home and to 'use force' to commit the robbery"). Under these circumstances, we conclude that the extent of the defendant's participation was not so attenuated and remote that it would be unjust to hold him responsible for the criminal conduct of his coconspirator, Calabrese.[31]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant also was convicted of felony murder and conspiracy to commit robbery in the first degree. The trial court vacated his conviction of those charges to avoid double jeopardy concerns. See footnote 31 of this opinion.

[2] See *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

[3] See *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946).

[4] The burnt clothing and sneakers later were discovered, and subsequent forensic testing revealed that footwear imprints from the crime scene probably were made by the right sneaker.

[5] "The plain error doctrine is based on Practice Book § 60-5, which provides in relevant part: The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . . The plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A party cannot prevail under [the] plain error [doctrine] unless [he] has demonstrated that the failure to grant relief will result in manifest injustice." (Internal quotation marks omitted.) *Cator* v. *Commissioner of Correction*, 181 Conn. App. 167, 177 n.3, 185 A.3d 601, cert. denied, 329 Conn. 902, 184 A.3d 1214 (2018).

[6] The state also responds that the defendant's challenge is "unreviewable because he never asserted in the trial court that Calabrese needed to be sworn in before responding to the trial court's questions." We disagree that the claim is unreviewable. See *State* v. *Nieves*, 89 Conn. App. 410, 414–15, 873 A.2d 1066 (reviewing, pursuant to *Golding*, unpreserved claim that court failed to hold hearing and require witness personally to invoke privilege against self-incrimination), cert. denied, 275 Conn. 906, 882 A.2d 679 (2005).

[7] The defendant makes only passing reference in his appellate briefs to his right to confrontation as the constitutional right violated.

[8] Niraj also was arrested on September 11, 2013. *State* v. *Patel*, 186 Conn. App. 814, 820, 201 A.3d 459, cert. denied, 331 Conn. 906, 203 A.3d 569 (2019). The trial court, *Danaher, J.*, presided over Niraj's jury trial, which was held in January and February, 2016. Niraj was convicted on multiple charges and appealed from the judgment of conviction to this court, which affirmed his conviction. Id., 857.

Judge Danaher also presided over the defendant's trial. At the request of

defense counsel, Judge Danaher took judicial notice of the totality of the filings and the transcripts of Niraj's case. During the defendant's trial, the court also referred to certain rulings issued in Niraj's trial.

Accordingly, this opinion references certain decisions, motions, and testimony from Niraj's trial where necessary to our consideration of the issues presented in this appeal.

[9] The trial court referred to two rulings in Niraj's trial as the "law of the case" when ruling on similar motions in the defendant's trial. See part III of this opinion. Aside from the defendant's accurate notation in a footnote in his principal brief that the law of the case doctrine is not applicable, neither party on appeal raises a claim of error in the court's presumably inartful reference to its rulings in Niraj's trial as the law of the case in the defendant's trial.

[10] Early did not know whether Calabrese was moved into his cell for the sole purpose of being recorded. Early testified: "I don't know if he was comin' in just for that reason. I know he got moved out [of] the dorm because of some, some foolishness he did in the dorm. So, when he came to my cellblock, the officer told me, I want you to try to see if you can get him . . . because I done it before."

[11] Defense counsel indicated his objection to the recording's introduction into evidence. The court noted that it had written an opinion on this issue in the trial of Niraj and indicated that it had not written the same opinion for this trial, but that it already had ruled on the issue. Defense counsel agreed that the motion was the same in both trials and indicated his understanding that the "ruling . . . stands," but advised that he planned to formally object in front of the jury to make a record.

[12] In his brief, the defendant relies on several factors, which he contends support a conclusion that Calabrese's statements were testimonial. First, he argues that there was no ongoing emergency and that the primary purpose of the interrogation, conducted thirteen months after the crime, was "to establish or prove past events potentially relevant to later criminal prosecution." *Davis* v. *Washington*, supra, 547 U.S. 822. Second, as to the "objective analysis of the circumstances of [the] encounter"; *Michigan* v. *Bryant*, 562 U.S. 344, 360, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011); he contends that Calabrese intentionally was moved to a specific cell in order to enable Early to gather evidence for the state to use against Calabrese in a criminal prosecution. Third, emphasizing that Early "was not a neutral listening device," the defendant states that Early interrogated Calabrese by asking "at least 200 questions." Fourth, the defendant places weight on the fact that Early had been asked by correctional staff and the state police to serve as a confidential informant, which, he contends, rendered Early an agent of law enforcement. Last, the defendant argues that "any reasonable person objectively would have known that such statements could be used against him. Indeed, Early confirmed that all prisoners are aware of the possibility of someone 'snitching them out' and becom[ing] a state's witness against them."

[13] Accordingly, this court, in *State* v. *Patel*, supra, 186 Conn. App. 831, recited the circumstances leading to Early's recording as follows: "After Calabrese was arrested, he and his cellmate were talking about the charges that were pending against them. Thereafter, the cellmate approached a security officer and offered to record Calabrese. The cellmate was set up with a recording device, and he recorded his conversation with Calabrese, who was unaware that he was being recorded."

[14] We also do not find persuasive the defendant's citation to a single unreported case from Texas in which the court found testimonial a declarant's statements made to his aunt while she was wearing a wire. *Cazares* v. *State*, Docket No. 15-00266-CR, 2017 WL 3498483, *11 (Tex. App. August 16, 2017), review refused, Texas Court of Criminal Appeals, Docket No. PD-0204-18 (May 23, 2018), U.S. , 139 S. Ct. 422, 202 L. Ed. 2d 324 (2018).

[15] The court found that the passage of thirteen months between the crime and Calabrese's statements weighs against the trustworthiness of the statements.

[16] The defendant argues that "Early would not have appeared to . . . be a fellow gang member," and points to Early's encouraging Calabrese to become a member of the "blood" gang. (Internal quotation marks omitted.) After Early told Calabrese he could "make shit happen" for him, Calabrese responded: "[I]t's basically the same shit anyway. Fuckin all my boys are fuckin bloods every time there's fucking something goin on I get fucking sucked into fuckin going." Even if Early would not have appeared to be "a fellow gang member," the evidence suggested that he was a member of a gang, with which all of Calabrese's friends were affiliated. Thus, the court did not err in considering this relationship in support of a finding of reliability.

[17] As to the third factor, the extent to which the statement was against

the declarant's penal interest, the defendant does not challenge the court's finding that Calabrese explicitly stated that he killed Vitalis and "ma[de] clear that any other person involved is less culpable than he is."

[18] Majmudar testified to the remainder of the conversation as follows: "So, I asked him why they robbed [Vitalis]. He said that they needed money to pay for Niraj's attorney fees. He said that [Calabrese] was supposed to rob Luke alone, that Niraj dropped [Calabrese] off near Luke's house first. When Luke's mom got home, [Calabrese] got cold feet and refused to rob [Vitalis] until Shyam showed up last minute.

"I asked him what happened during the robbery. He said the robbery went bad; [Vitalis] got shot. Shyam said he panicked, ran out of the house back to the car. [Calabrese] was still in the house looking for that money. Shyam didn't want to wait around and get caught, so he drove home as fast as he could to change his clothes.

"I asked him what happened to [Calabrese]. He said that he and Niraj drove around with the Pathfinder and eventually picked up [Calabrese] from the woods, and they burned everything they wore in different locations.

"I asked him if [Calabrese] used [the defendant's] phone during the robbery. He said yes. He said that he and [Calabrese] didn't use their own phones, cars or gun during the robbery. He said that Niraj was stupid to use his own phone to contact [Vitalis] that day. I asked him where they left their phones. He said [Calabrese's] phone was with Niraj. Shyam said he left his phone at home.

"I asked him why my parents' two black [sport utility vehicles] were seized. He said they used the black Saab [sport utility vehicle] from New York during the robbery.

"I asked him what happened to the gun. He said that he and Niraj gave the gun to [their cousin] to get rid of.

"I asked him if [the defendant] ever came to Warren earlier that day. He said he never came that day, he came two weeks later.

"I asked him why he was charged with so little, with hindering prosecution and tampering with evidence, why his bond was only fifty thousand when everyone else's was at least one million or more. He said that he threatened [Calabrese], threatened to go after his sister if [Calabrese] ever gave him up.

"I was infuriated. I told Shyam that he needed to come forward and confess. He said that he couldn't do that to his parents, that Niraj may go down for this and his parents couldn't lose him as well.

"I told him that he needed to leave, and I never saw Shyam again."

[19] The court also indicated that it did not "believe there's been a sufficient showing that Shyam Patel is unavailable" but stated that "the decision I am rendering does not at all turn on that fact." Because we conclude that the court did not abuse its discretion in determining that Shyam's statement was not trustworthy, we need not address the court's finding that the defendant had not established that Shyam was unavailable.

[20] Likewise, the court did not err in determining that the thirteen month time period between the crime and Shyam's statement weighed against a finding of trustworthiness, notwithstanding that his statement was made within a few weeks of his arrest. See *State* v. *Lopez*, 254 Conn. 309, 317, 757 A.2d 542 (2000).

[21] The court also noted Majmudar's relationship to the defendant in its consideration of the person to whom Shyam's statement was made. "[A] trial court may not consider the credibility of the testifying witness in determining the trustworthiness of a declaration against penal interest." *State* v. *Rivera*, 268 Conn. 351, 372, 844 A.2d 191 (2004). Our Supreme Court has considered the witness' relationship to the defendant, however, as a factor " 'coloring' " the trustworthiness of the proffered statements. *State* v. *Payne*, 219 Conn. 93, 115, 591 A.2d 1246 (1991) (agreeing with trial court's conclusion that long-standing relationship between defendant and witness would not lead to conclusion of trustworthiness).

[22] There was evidence at trial that Shyam sent the following text messages to Niraj at 8:13 p.m. on August 6, 2012: "U want me to come to the station in pathfinder?"; "?"; "Lemme know . . . I got keys." A white Pathfinder, registered at the home Shyam shared with his parents and, occasionally, Niraj, was seized by police. The vehicle smelled clean and seemingly had new floor mats. A receipt dated August 31, 2012, at 10:40 a.m. from Personal Touch Car Wash in New Milford was found in a bedroom at Shyam's home, and Shyam's cell phone utilized two cell towers in the vicinity of the car wash around the date and time printed on the receipt.

[23] There was evidence at trial that there were Google searches conducted on Shyam's computer for the terms "conspiracy to commit murder in Con-

necticut" and "conspiracy to kill," along with searches for penalties for those crimes.

[24] The defendant also claims that the court's exclusion of Shyam's statement violated his constitutional rights to present a defense and to due process of law. We disagree. "The defendant's rights to present a defense and to due process do not give him the prerogative to present any testimony or evidence he chooses. In the exercise of his constitutional rights, the accused, as required of the [s]tate, must comply with the established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." (Internal quotation marks omitted.) *State* v. *Rosado*, 218 Conn. 239, 249–50, 588 A.2d 1066 (1991).

[25] Wines testified that an engineering phone is "a phone that's set up to show you the—the signals that it's receiving from the tower. It shows you what's happening on your cell phone in the background that you don't see. It presents it on the screen, so that you can kind of spot check and confirm what a particular phone from a particular carrier—what it sees as the strongest, cleanest signal at a particular time."

[26] In situations in which a cell phone connects to a tower that is not the closest tower to the cell phone, Wines stated, he would try to conduct a drive test "if the network was still in the same condition that it was in at the time the crime occurred." In the present case, Wines stated that there had been changes to the AT&T network, so a drive test was not possible. A drive test had been conducted three weeks prior to the homicide, however, and a signal from tower 1025 was present along Route 4, approximately two miles southeast of the crime scene.

[27] See footnote 9 of this opinion.

[28] The defendant does not dispute that he agreed at trial that the court could rely on the evidence presented at the hearing on the motion in limine in Niraj's trial.

[29] In a one sentence footnote in his appellate brief, the defendant argues that "[t]he state did not meet its burden of showing that Wines was qualified as an expert . . . and the court never expressly decided that 'preliminary question.' " (Citation omitted.) This argument is inadequately briefed and, accordingly, we decline to review it. See *State* v. *Prosper*, 160 Conn. App. 61, 74–75, 125 A.3d 219 (2015).

[30] Majmudar testified that she and the defendant celebrate Raksha Bandhan, an annual religious festival celebrating the bonds between brothers and sisters, and that the 2012 festival was scheduled for August 2. Majmudar testified that because she was out of town on August 2, she and the defendant arranged to meet at her home on August 6. According to Majmudar, after notifying the defendant that she would arrive home late, Majmudar arrived at about 7 p.m. The defendant was parked with his car door open and was looking for something, which she thought was his cell phone. She stated that they then went inside her home and performed the ceremony, which took no longer than five minutes, and that the defendant left within two hours to return home to Branford to let the dog out. Majmudar testified that she learned about the homicide two days after the defendant was arrested on September 11, 2013. According to Majmudar's testimony, she realized that the defendant came to see her on the day of the homicide and then she told her mother that he could not have been involved.

[31] We further note that the jury also found the defendant guilty of felony murder. See footnote 1 of this opinion. Upon motion of the defendant, the court vacated the conviction of felony murder to avoid double jeopardy concerns. Consequently, even if there was insufficient evidence to sustain the defendant's conviction of murder predicated on *Pinkerton* liability, the felony murder conviction could be reinstated on remand. See *State* v. *Miranda*, 317 Conn. 741, 753–54, 120 A.3d 490 (2015) ("[W]e see no substantive obstacle to resurrecting a cumulative conviction that was once vacated on double jeopardy grounds—provided that the reasons for overturning the controlling conviction would not also undermine the vacated conviction. . . . [A] jury necessarily found that all the elements of the cumulative offense were proven beyond a reasonable doubt. Put differently, although the cumulative conviction goes away with vacatur, the jury's verdict does not.").